No. 12,461.

### ROMERO & BAYARD VS. H. & C. NEWMAN.

A factor holding as collateral security for the payment of the ultimate balance to be due him on his factor's account the negotiable note of his customer, bearing interest after maturity, and secured by mortgage on his plantation, must be prepared to surrender the collateral when the account is closed, and payment of the amount due is tendered him by the debtor.

If such collateral note has been transferred by the creditor before its maturity to a third person, and by reason of such fact the factor can not surrender it, he will be responsible to the maker of the note for any amount over and above that due on the account (payment of which has been so tendered) which he was forced to pay to the third holder of the note.

Where such a collateral note had been given to a factor to secure a specific debt, the latter can not refuse to surrender the same when the debtor tenders payment of the debt which it secures, by reason of alleged indebtedness of the customer upon unliquidated and disputed claims arising from other separate and distinct contracts.

A creditor who in bad faith retards or prevents the execution of a contract to do can not claim from the debtor damages for the non-execution of the contract. C. C. 1934, par. 4.

Where the execution of a contract has been rendered impossible in its entirety by reason of a fortuitous event not preceded by some fault of the debtor, the creditor can not exact damages for non-execution. C. C. 1933.

If the contract to do, consists of successive obligations to be performed at different times, the non-execution by the debtor of one of these successive obligations by reason of a fortuitous event not preceded by some fault of the debtor, withdraws from the creditor the right to exact damages for the non-execution of that particular obligation. C. C. 1898.

A contract between a factor and a planter by which the latter binds himself to ship his crop to the factor, who is authorized to charge two and a half per cent. commission on sales of the same, does not justify the factor in charging two and a half per cent. commission on the amount of the bounty paid by the government to the planter in the crop. The bounty does not represent sales made by the factor.

In a contract between a planter and the owner of a refinery, the planter engaged to grind for a number of years the cane upon his plantation, at his own sugar house, to there convert it into syrup and then to convey it to the refinery through pipes purchased and laid down at its own expense by the refinery, the refinery engaging to convert the syrup into sugar at a fixed price per pound. During the second year of the contract a fire destroyed the planter's sugar house, placing it out of his power to comply further with his obligations. The contract contained a clause, that the planter should, at the end of the contract, purchase the pipes at their value. *Held*, that the refinery owners in thus assuming the deterioration of the pipes during the contract did so in view of continuing benefits to itself to result from it, and being deprived of those benefits by the fire, the court would give the refinery the benefit of the highest estimate placed upon the value of the pipes sustainable under the evidence.

APPEAL from the Civil District Court for the Parish of Orleans. *Ellis, J.*

*Fenner, Henderson & Fenner, Foster & Broussard* and *Joseph F. Poché* for Plaintiffs, Apellees.

*Clegg & Quintero* for Defendants, Appellants.

Argued and submitted December 4, 1897.
Opinion handed down January 10, 1898.

The opinion of the court was delivered by

NICHOLLS, C. J. The plaintiffs are the owners of the Daisy plantation in the parish of Iberia, which they have been cultivating as a sugar plantation.

The defendants are factors and commission merchants in the city of New Orleans. They are also owners of the Linden plantation in Iberia parish, upon which they operate a sugar refinery.

On the 31st of August, 1890, a contract was entered into between the plaintiffs and defendants by which the latter agreed to lay a two-inch pipe from the Linden refinery to the sugar house of the plaintiffs and to furnish a pump to pump the syrup made by the latter from their sugar house to the Linden refinery, at the expense of the defendants, and to refine and granulate said syrup at the rate of one cent per pound, and to furnish sugar and molasses barrels in good order at defendants' refinery. Plaintiffs agreed to boil the juice down and to furnish same as well clarified and in as good a condition as

possible. It was well understood that defendants were free from all liability from loss occasioned by *non*-working of machinery, breaking, bursting of pipes or any or whatever loss in the premises before received in their refinery, or from any loss from frozen cane or sour syrup.

It was further understood that the contract should cover a period of five years, to-wit: 1890, 1891, 1892, 1893, 1894, and at the expiration of the contract plaintiffs should become the purchasers of the pipe and pump so laid down at the price to be agreed on between the parties, or, if necessary, by arbitration of outside parties.

Separate and apart from this contract there existed between the plaintiffs and defendants, the relation of planters and factors. Defendants agreed to furnish the necessary advances in money and supplies for the cultivation of plaintiffs' plantation, and they to secure defendants the reimbursement of their advances delivered to the latter first in 1891, a note for five thousand dollars, secured by mortgage on their plantation, and afterward, on the 24th of February, 1892, a note of that date, for six thousand dollars, payable on the 1st of April, 1893, to the order of H. & C. Newman, at their office in New Orleans, with eight per cent. interest from date, secured by a new mortgage on the same property. The last mortgage was to secure a small balance due on the advances of 1891, as well as those to be made in the future in 1892.

The contract first mentioned continued in force until some time in 1892, when by the destruction of plaintiffs' sugar house by fire they became unable to carry out their obligation to deliver to the defendants syrups made at the same.

During the years 1891 and 1892 differences arose between the parties; plaintiffs claiming compensation for a quantity of syrup which they asserted had been caused to be lost through the negligence of the defendants and their employees, and defendants contending that they were authorized to demand from the plaintiffs the profits which they would have made under the contract had it been carried to completion, and also the price of the pump and pipes.

After numerous negotiations the parties finally agreed to submit their differences to arbitrators. An arbitration was attempted, bu it failed in its purpose, and as neither side claims rights under it, no further reference to it need be made.

On the 21st of March, 1893, defendants forwarded to plaintiffs

Romero & Bayard vs. Newman.

a statement of their advance account as being three thousand four hundred and seventy-seven dollars and forty-eight cents, of which two hundred and fifty-four dollars and seventy cents were charged to plaintiffs as commissions of two and one-half per cent. on the bounty which the latter had collected from the United States government.

Plaintiffs had bound themselves in the factorage contract to ship their crops to defendants for sale for their account, and the latter insisted that they were entitled to deal with the bounty money as if sugar to the value thereof had been consigned to them for sale and had been sold by them for plaintiffs on the usual commission on sales.

On the 16th of March Messrs. Foster & Broussard, attorneys of the plaintiffs, wrote a letter to the defendant on behalf of their clients, in reference to said account, in which they stated that the latter were willing and ready to settle their indebtedness to them, but that they would not pay the charges for bounty, which cn the account amounted to two hundred and fifty-four dollars and seventy cents. That, in other words, if they would return their two notes (the five thousand dollar and the six thousand dollar notes) to the New Iberia National Bank and their account corrected, that is showing balance due three thousand two hundred and twenty-two dollars and seventy-eight cents, with instructions to the bank upon payment of this last amount they must turn over the notes to the plaintiffs and give full receipt to them, the three thousand two hundred and twenty-two dollars and seventy-eight cents would be paid at once. That this, however, was not to be construed as a waiver of any further reduction which plaintiffs might have as to interest and other overcharges in case of litigation, which they specially reserved.

Shortly after receipt of this letter defendants sent C. H. C. Brown to New Iberia to represent them in this matter in an interview with the parties and their attorneys at that place. A meeting took place between them in the latter part of March, at which the account was fully discussed and an offer was again made on behalf of the plaintiffs to pay the account that day if defendants, through Brown, would deduct the charge for commissions on the bounty money, but this offer was declined. In the course of the conversation which then took place Brown referred to the fact that defendants claimed that

plaintiffs were indebted to them for *profits* on the "refinery account," and for the price of the pump and pipes which they had laid down, but plaintiffs refused to discuss those claims, as they bore upon distinct and separate matters. Brown intimated to plaintiffs that the promissory note for six thousand dollars was not yet due; that defendants could transfer the same before maturity and force any litigation which might arise between plaintiffs and defendants to be prosecuted in New Orleans.

A few days after this, Romero, one of the plaintiffs, and R. F. Broussard, one of their attorneys, called at the office of H. & C. Newman, in New Orleans, and there matters were again discussed, and the agreement to submit their respective claims to arbitration, to which reference has already been alluded, was reached. No allusion was made at that time to the fact that the note of six thousand dollars had been transferred to E. Feibelman & Co.

In ————, 1893, the latter firm instituted executory proceedings in Iberia parish upon that note, claiming to be the owners of the same, before maturity, in due course of trade and for a valuable consideration, and demanding payment of the note with interest, attorney's fees and costs. The present plaintiffs obtained an order for a suspensive appeal from the order of seizure and sale, but the appeal was dismissed in consequence of the appeal bond having been made for too small an amount. In order to stop proceedings, plaintiffs were forced to pay Feibelman & Co., on the 24th of February, 1894, the note with interest, and also attorney's fees and costs. The whole amount so paid by them amounted to the sum of seven thousand four hundred and eleven dollars and twenty cents.

On the 1st of August, 1894, the present action was instituted by plaintiffs against the defendants in the city of New Orleans, in which judgment is prayed against defendants for seventeen thousand four hundred and seventy-five dollars, with legal interest from judicial demand.

The amount is made up, first, of a claim that defendants are indebted to plaintiffs in the sum of twenty-eight hundred dollars for a quantity of syrup lost to them by the negligence of defendants under the "Refinery Contract" in 1891 and 1892; second, of a sum of four thousand one hundred and eighty-eight dollars and ninety-two cents, as being the difference between the amount actually due on the 21st of March, 1893, by plaintiffs to defendants upon their

account secured by their collateral note of six thousand dollars and seven thousand four hundred and eleven dollars, the amount which they were forced to pay Feibelman & Co. to obtain the release of their property from seizure; third, of the sum of four hundred and eighty-seven dollars and sixty-seven cents, proceeds of sugar and molasses sold by them since the 21st of March, 1893, at which date defendants' account was presented to them; and fourth, of the sum of ten thousand dollars claimed of defendants as damages for defendants' illegal and malicious conduct in transferring their note of six thousand dollars to Feibelman & Co., and occasioning through the latter firm the seizure of their property.

They alleged that they were, on the 21st of March, willing and ready, and offered to defendants to pay them in full for the balance which they owed them after deduction of the commission erroneously and illegally charged to them on the bounty money, and to take up their note of six thousand dollars, then held by them and to fall due on the 1st of April, but that defendants peremptorily refused the proffered settlement and transferred said note to Feibelman & Co. That defendants knew with certainty that at the time of the transfer their indebtedness to them did not exceed the balance shown by the statement furnished by them to petitioners, which showed a balance against them of only thirty-four hundred and seventy-seven dollars and forty-eight cents, and that they verily believed and therefore alleged that said transfer of said promissory note was made with the malicious intent to cause damage and injury to them.

They further alleged that defendants had admitted their obligation to account to them for the difference between the amount realized by them on the note of six thousand dollars and the amount due them by petitioners, but that they had declined, neglected and refused to pay the same, notwithstanding amicable demand for the payment thereof. Defendants pleaded the general issue. They averred that the amount claimed of them by plaintiffs for the loss of syrup in 1891 and 1892 had been fully paid in the settlements made between the parties of the refinery account. They denied that in negotiating the promissory note of six thousand dollars they acted beyond their legal rights or in an illegal manner, and that they were actuated by motives of ill will or malice toward plaintiffs or by any desire to injure them in their legal rights; they denied that plaintiffs suffered therefrom any loss or damage which they could not

have averted by the exercise of legal means and slight expense and by ordinary efforts. They denied that the property of plaintiffs was seized as a consequence of the negotiation of said note; that they were deprived of the possession and control of their property as stated in their petition, and that plaintiff suffered any loss or damage thereby in the premises which was not due to their own resistance of the payment of their legal indebtedness, or that they suffered any loss or damage thereby which they are entitled to recover against them.

Assuming the position of plaintiffs in reconvention, defendants alleged that Romero & Bayard were indebted to them in the sum of seventeen hundred and eight dollars and sixty-six cents, and in the further sum of twenty-seven hundred and seventeen dollars and forty-one cents, with legal interest from judicial demand, for which amounts they prayed for judgment.

The first amount was claimed as being due to them as the profits which they would have realized from the refinery contract had it been carried to completion according to its terms, and the second amount as being due them as the price of and value of the pump they had furnished to plaintiffs, and of the pipes which they had laid between the Daisy and Linden plantations.

With reference to the first of these claims, defendants alleged that during the years 1893 and 1894, plaintiffs wholly failed to furnish any syrup to the refinery of respondents for refining; that the profits to which they would have been entitled for the refining of the syrup for plaintiffs during said years would have amounted in the aggregate to the sum claimed; that the failure of the plaintiffs to furnish said syrup was in violation and breach of their contract, and defendants were entitled to recover said profits from the plaintiffs.

The District Court rendered judgment in favor of the plaintiffs for the sum of thirty-nine hundred and ninety-six dollars, and seventy-four dollars, with legal interest from judicial demand.

It appears from the reasons assigned for the judgment that this amount was reached by adjudging that defendants were indebted to the plaintiffs in the sum of four thousand six hundred and seventy-six dollars and nine cents, and that plaintiffs are indebted to the the defendants in the sum of six hundred and seventy-nine dollars and thirty-five cents—the amount for which judgment was rendered, being the difference between these two sums.

The four thousand six hundred and seventy-six dollars and nine cents so adjudged to plaintiffs is the difference between the amounts actually due by the plaintiffs to defendants on the 21st of March, 1893, as per their account furnished that day (striking from said account the amount claimed for commissions on bounty money collected by the plaintiffs), and the amount paid by plaintiffs to Feibelman & Co. to obtain the release of their property from seizure, to which was added the sum of four hundred and eighty-seven dollars and sixty-seven cents, proceeds of sugar and molasses sold by defendants for account of plaintiffs after the 21st of March, 1893.

The six hundred and seventy-nine dollars and thirty-five cents adjudged to defendants is the amount fixed by the District Court as the value of the pipes laid by defendants between the Daisy and Linden plantations.

The court obviously disallowed on the one hand plaintiffs' demand for the loss of syrup in the years 1891 and 1892, and their claim for ten thousand dollars damages, and on the other defendants' demand for profits which they claimed would have been realized on the refinery contract for the years 1893 and 1894, had plaintiffs furnished them with syrup during those years under the terms of that contract, and also rejected the price claimed for the pump furnished to plaintiffs. Defendants appealed.

Plaintiffs in the Supreme Court prayed that the judgment should be amended in their favor by allowing them the ten thousand dollars which they claimed for damages, and by rejecting entirely defendants' reconventional demand, or sustaining it at the very utmost to the amount of two hundred and twenty-six dollars and fifty cents.

We are of the opinion that the judgment of the District Court negativing and rejecting plaintiffs' demand for ten thousand dollars damages and their claim for loss of syrup in the years 1891 and 1892 is correct; that it is also correct in disallowing defendants' claim for the value of the pump which they furnished to the plaintiffs. The claim for the loss of the syrup was adjusted and settled prior to the institution of this action in the settlement between the parties of the refinery account. There is no evidence before us which would justify a judgment in favor of plaintiffs for damages, as is claimed by them for loss of credit, annoyance, etc.

The evidence in the record shows that the pump referred to was

rendered valueless by the fire which consumed plaintiffs' sugar house.

Having disposed of so much of the contentions between the parties, we now direct our attention to the other demands advanced by the plaintiffs. Defendants claim that the six thousand dollars note referred to in the pleadings and in the evidence was their absolute property; that they had the legal right to dispose of it; that having done so they are not responsible for the interest which accrued upon the same after plaintiffs offered to pay their indebtedness to them, nor for the costs of the executory proceedings which were taken out by Feibelman & Co. upon the note, nor for the fees of attorneys provided for by the act of mortgage securing the note. Defendants say that the mortgage securing the note was not negotiable, as was the note itself, and that if plaintiffs had defences to Feibelman's demand, they could and should have urged and made them available in those proceedings. The note was not the absolute property of the defendants; it was simply placed in their hands as collateral to secure the balance to be due upon the factorage account. By placing a negotiable instrument in the hands of the defendants they undoubtedly placed it in the power of the latter to transfer it free from the equities in favor of parties acquiring it before maturity in due course of trade for a valuable consideration. But the power to do this is a very different thing from the right to do it, as between the present plaintiffs and defendants. Granting that defendants could have legally pledged to third parties the negotiable note pledged to themselves by the plaintiffs, they took upon themselves the obligation of being prepared to surrender and of surrendering the same to defendants whenever the latter should offer to pay the principal debt which it secured.

Had the note in question been in defendants' hands, as it should have been when plaintiffs offered, as they did, to pay their account in full, and had they refused as they did refuse to surrender the same on the ground that plaintiffs were indebted to them for commissions upon the bounty money which they had collected from the United States government, litigation which defendants would have provoked under such circumstances on the note would have resulted in the plaintiffs being forced to pay their own attorney's fees and costs, and to have had rejected any claims for the interest which had accrued on the debt after defendants' offer to pay, unless they could have

maintained the correctness of their claim to commissions. And *a fortiori* would this have been the result had the refusal to surrender the note been based upon the pretension of a right of detention of the same until disputed, unliquidated claims upon separate and distinct contracts should be adjudicated upon by the courts.

Defendants can not either in law or in justice alter this legal result and impose increased obligations upon the makers of the note by transferring it to third parties and causing litigation to be carried on in their name so as to cut off an inquiry into legally existing defences and equities. "*Nul prendra de son tort.*"

True it is, that Feibelman & Co. as against the present plaintiffs and themselves might recover the note with interest, costs and attorney's fees, but this increased amount of liability by Romero and Bayard would be the direct consequence of the active violation by H. & C. Newman of their legal duty to surrender the note on an offer by the makers to pay, and they are bound to save plaintiffs harmless from the effect of their act.

There was no actual tender of money by plaintiffs, but defendants by their conduct relieved the latter from making it. Teutonia Bank vs. Loeb, 27 An. 110; Alter vs. Shepperd, 27 An. 210; Laloire vs. Wiltz, 29 An. 329; Zimmerman vs. Langles, 36 An. 68. There is no reason to suppose that plaintiffs were not then and there prepared to make payment, or that they would not have then made payment of their debt had defendants been willing and in position to receive it and surrender plaintiffs' note. They unquestionably determined not to surrender the note or receive payment except upon unauthorized conditions.

We are of the opinion that defendants were not entitled to commission upon the bounty collected by the plaintiffs (Delogny vs. Creditors, 48 An. 488), and, therefore, that that claim furnished no legal basis upon which to decline to surrender the collateral note, and that still less did unliquidated demands upon separate and distinct contracts furnish such a basis.

The item for commissions on bounty having been the only item at issue between the parties—its rejection left the amount justly due on the account that which the plaintiffs admitted to be due and offered to pay.

It is not denied that since the date of that account defendants have received and sold sugar and molasses for account of plaintiffs.

to an amount of two hundred and eighty-seven dollars and sixty-seven cents, and that that sum stood to their credit on their books.

The amount, therefore, which the District Court found to be due for plaintiffs' demand in their favor and against the defendants (four thousand six hundred and seventy-six dollars and nine cents) was justified by the law and the evidence, and the finding to that effect is affirmed.

We have now to examine the claim of defendants for profits upon the refinery contract for the years 1893 and 1894, and for the price of the pipes laid by them between the Daisy and Linden sugar houses.

The sugar house on the Daisy plantation was destroyed by fire in 1892, and so far as this record shows has never been rebuilt.

It is not claimed that the burning of the building was the result of negligence either of plaintiffs or their employees.

The District Court held that under the provisions of the second section of Art. 1933 of the Civil Code, which declares that " where by a fortuitous event or irresistible force the debtor is hindered from giving or doing what he has contracted to give or do, or is from some cause compelled to do what the contract bound him not to do, no damages can be recovered for the execution of the contract."

· Had the contract in this case been one covering the crop of one single year, and had the building been (without plaintiffs' fault) destroyed during the grinding season, it would have been an utter impossibility for the plaintiffs to have complied with their obligations, and plaintiffs would have clearly been entitled to the provisions of the law cited. So also had the object of the obligationa been certain and determinate thing. (C. C. 2219.) The question is complicated in the present instance by the fact that the contract extended over several years, and had reference to several separate and distinct crops, and that the fulfilment of that obligation by plaintiff was not absolutely and necessarily rendered impossible by the fire. As a matter of course defendants were without right or power to exact specifically that plaintiffs should rebuild their sugar house. Certainly, in the absence of a stipulation by the plaintiff that they should rebuild in case of fire, they could not be constrained to do so. We are not called on to deal with that phase of the question, but with the rights and obligations of parties where they have simply failed to do so.

Article 1891 of the Civil Code declares that " the object of a contract must be possible, by which is meant physically or morally

possible. The possibility must be determined, not by the means or ability of the party to fulfil his engagements, but by the nature of the thing which forms the object of it," and Art. 1899 that " if the contract consists of several successive obligations to be performed at different times, and the equivalent is not given in advance for the whole, but is either expressly or impliedly promised to be given at future periods, then, if the cause of the contract corresponding to either of these obligations should fail, the obligation depending on it will cease also. Thus we learn for years the obligation to pay the yearly rent ceases if the property which is leased shall be destroyed."

Laurent (Vol. 16, Des Obligations, Sec. 250 *et seq.*) refers to the distinction between cases where by force of fortuitous events the fulfilment by the debtor of his obligations is placed absolutely beyond his power, putting an end to the contract, and those where the execution of the same is merely retarded, delayed or made more onerous and difficult, also those where the difficulty in the way of execution is simply relative to the debtor.

He also incidentally refers to certain cases where obligations are to be successively executed (Sec. 270).

The view we take of the situation of the parties to this litigation dispenses us from expressing any opinion as to what their respective rights and obligations would be under ordinary circumstances. We have declined to render judgment in favor of plaintiffs upon their claim for ten thousand dollars damages, but we are of the opinion that the course which defendants pursued of actively and illegally placing obstacles in the way of plaintiffs' ability to rebuild their sugar house, by tying up their resources and causing their plantation to be placed under seizure, withdraws from them any rightful claim to profits, assuming such a claim could have been otherwise urged. We are of the opinion that the District Court placed too low an estimate upon the value of the pipes laid by the defendants between the two sugar houses. It may be true and doubtless is true that in certain places the pipes may be much deteriorated, but we think that the extent of the deterioration of those portions of the pipes which were laid in the high lands between the two buildings was by the court overestimated under the evidence. We think that the value of the piping should be fixed at thirteen hundred dollars. We reach this conclusion the more readily as it accords with the equities of the case. When the defendants entered into the contract by

which plaintiffs were to purchase the pipes at the termination of the contract at the value which they might then have, the value to be fixed by estimation, it was evidently in view of the fact that in the interval between the formation of the contract and its ending they would themselves have drawn certain continuing benefits from the use of the pipes. Of this use they have been deprived by a fire for which they were not responsible.

In view of all the facts of this particular case we are of the opinion that the judgment appealed from should be amended to a certain extent.

For the reasons herein assigned it is hereby ordered, adjudged and decreed that the judgment of the District Court upon the reconventional demand set up by the defendants be amended by increasing the amount found due thereon by the District Court from six hundred and seventy-nine dollars and thirty-five cents to thirteen hundred dollars. The effect of this amendment will be to reduce the judgment for which judgment should have been given in the District Court in favor of plaintiffs against defendants from three thousand nine hundred and ninety-six dollars and seventy-four cents to three thousand three hundred and seventy-six dollars and nine cents. For the reasons herein assigned it is hereby ordered, adjudged and decreed that the judgment of the District Court be amended, and it is now ordered, adjudged and decreed that there be judgment in favor of the plaintiffs, Romero & Bayard, and against the defendants, H. & C. Newman, for the sum of three thousand three hundred and seventy-six dollars and nine cents, with legal interest from judicial demand until paid. Costs of the lower court to be paid by appellants, those of appeal by appellees.