R. T. STARRETT, et al. v. O. B. POLK LUMBER COMPANY.

Western Section.    February 5, 1932.

Petition for Certiorari denied by Supreme Court, June 4, 1932.

Sively, Evans & McCadden, of Memphis, for appellant.
H. R. Boyd and J. H. Poston, for appellee.

SENTER, J.   Complainants, R. T. and W. C. Starrett, filed the original bill in this cause against O. B. Polk Lumber Company seeking to recover the sum of $1100 alleged to have been wrongfully and unlawfully retained by the defendant O. B. Polk Lumber Company, out of certain fire insurance proceeds collected by the defendant.

The bill alleges in substance that in June, 1928, complainants, who were then engaged in the lumber milling business at Seiper, Rapides Parish, Louisiana, entered into a contract with the defendant, O. B. Polk Lumber Company, by the terms of which complainants appointed the defendant their exclusive selling agent for all the hardwood lumber cut by their mill, and for which the defendant was to receive a commission of ten per cent.   The bill further alleges that a large amount of lumber was cut, sawed and stacked upon their lumber yards at Seiper, Louisiana, and that in accordance with the terms of the contract, defendant advanced to complainants on the lumber so cut and stacked on its yards, the sum of $16,875.58, and that there was shipped out by complainants on orders sold by the defendant lumber to the value of $11,211.25, and there remained due under said contract from complainants to the defendant the sum of $5,664.33; that by the terms of said contract it expired on December 31, 1928.   The bill alleges that about March 8, 1929, the lumber on said yard was all destroyed by fire, and that the defendant collected all of the fire insurance under policies issued on said lumber, which policies were made payable to the defendant as its interest might appear.   The bill alleges that in addition to the taking out of said insurance funds, the total amount of the indebtedness

which complainants then owed to defendant, that defendant retained and now refuses to pay to complainants the sum of $1100, claiming that said amount of $1100 was an estimated compensation on the lumber that was burned, but which had not been sold by defendant in accordance with the terms of the contract. Complainant further alleges that there was no sale of the lumber by defendant that was totally destroyed by fire, and that the defendant is not entitled to retain the said $1100, and that said sum so retained is due and owing to complainants from the defendant with interest thereon at the rate of six per cent per annum from the date of the collection of said insurance, and prays for a judgment against the defendant for said sum with interest.

By its answer the defendant admits the allegations in the bill with reference to the contract and the advance by it of the sums stated in the bill to complainants for the lumber cut and stacked on the yards, and that the same was insured with loss payable clause in the insurance policies making the insurance payable to the defendant as its interest may appear. The answer admits the collection of the proceeds of the fire insurance policies, and admits that it retained the $1100 as charged in the bill, but denies that it is not entitled to retain the same, and claims that it is entitled to retain the $1100 as commissions or compensation under contract between the parties.

There is no material conflict in the evidence, and the only question presented on this appeal is the proper construction of the contract.

At the hearing of the cause the Chancellor held and so decreed that the defendant was not entitled to retain said $1100, and that the defendant's right to commissions under the contract was ten per cent on all lumber which had been sold. Several car loads of lumber had been sold and shipped after December 31, 1928, and one car had been sold but it had not been shipped at the time of the fire. The Chancellor held and so decreed that defendant was entitled to receive compensation by way of commissions on that car although the same had not been shipped, the same however having been sold by the defendant and not loaded out at the time the fire occurred, and allowed a credit to the $1100 for the commissions on that car, amounting to $55, and decreed a judgment in favor of complainant for the balance, $1,045, with interest, $147.91, or a total of principal and interest, $1192.91, and the costs of the cause. From this decree the defendant prayed and was granted an appeal to this court, which appeal has been perfected and errors assigned.

There are three assignments of error, but they are all embraced and covered by the third assignment, which is as follows:

"The court erred in holding that Starrett gained an advantage of $1100 by the destruction of the lumber, over and above what he would gain by the continued existence of the

lumber. Whereas, in fact, the policies of insurance were intended to secure to the respective parties the same pecuniary rights or advantages in the event of a fire, as they would have and obtained if the lumber continued in existence. To construe the contract so as to make it to the interest or advantage of one of the parties for the lumber to be destroyed, would be against public policy."

The facts may be briefly stated as follows: In the year 1928, the Starretts were the owners of a saw-mill plant at Seiper, Rapides Parish, Louisiana. The defendant was at that time engaged in the lumber business and the marketing of lumber at Memphis, Tennessee. The Starretts needed financial assistance to operate their business. The defendant had good marketing facilities. The Starretts, by correspondence, began the negotiations with the defendant to procure funds to enable them to purchase logs and timber and to cut same into lumber. These preliminary negotiations resulted in a contract being entered into between the respective parties. The contract was written in Louisiana and prepared by the attorney of the Starretts. Under this contract the defendant agreed to advance to the Starretts the sum of $21 per thousand feet of No. 2 common and better grades of lumber when the lumber had been put in piles or stacks on the lumber yard of the Starretts at Seiper, Louisiana. Defendant was to receive interest at the rate of eight per cent per annum on all money so advanced under the contract, and the same to be secured by chattel mortgages to be executed by complainants to the defendant on the lumber cut and stacked, and to be protected by fire insurance policies for the full value of the lumber with loss payable clause making the insurance payable to the defendant as its interest may appear. The contract also appointed defendant as the selling agent to market the lumber and for which services the defendant was to receive commissions at the rate of ten per cent of the sale price of the lumber. This was an exclusive sales agency. The contract was entered into about June 8, 1928, and was to continue until December 31, 1928. However, it is disclosed by the record that the lumber, with the exception of the magnolia, had to stay in the stack from thirty to ninety days before it was ready for marketing. Between December 31 and the date of the fire in March, the defendant had sold twelve car loads of the lumber, eleven cars of which had been shipped out, and the other car, although contracted for sale, had not been shipped. The chattel mortgage or trust deed executed by complainants on the lumber to secure the advances recited as follows: ". . . to secure the full and prompt payment of advancements, interest and commissions of O. B. Polk Lumber Company under contract." The respective stacks of lumber on which the chattel mortgages covered were identified by being marked as the lumber covered by the mortgages or trust deeds.

The contract between the parties is as follows:

"1. In consideration of your agreement to advance us money on lumber as hereinafter provided, we, R. T. Starrett & Son, a partnership composed of R. T. Starrett and W. C. Starrett, said partnership being domiciled at Seiper, Rapids Parish, Louisiana and operating a saw-mill at Seiper, in Rapids Parish, Louisiana, have hereby and in these presents appoint you our exclusive selling agent for the entire hardwood cut of our said mill, presently on hand and unused and for the entire hardwood cut thereof for the period of time hereinafter stipulated.

"2. We agree to cut our lumber and timber in accordance with your instructions, but in no event are we expected to cut less than one inch in thickness, and to ship our lumber according to your shipping directions guaranteeing grade and measurements in accordance with the current rules of the National Hardwood Lumber Association.

"3. In consideration of our appointing you our exclusive selling agent, you agree to secure for us the highest price you can secure from your customer at the time and place of sale, to guarantee their credit, and to have the privilege of changing shipping instructions before or after shipments are made.

"4. In consideration of our appointing you our exclusive agent, you agree to make us an advance of twenty-one and no/100 dollars ($21) per thousand feet on No. 2 common and better hardwood lumber every two weeks on or before our regular pay day during the term of this contract after the lumber has been put in piles on the following terms. We agree to furnish chattel mortgage and guarantee the lumber at time of delivery under said mortgage free from all liens, labor bills of every description, or other claims. Mortgage or pledge to be legally and properly executed and recorded at our expense and we to furnish you with certified copy of such mortgage after its recordation.

"5. We will mark each pile numerically for identification purposes, and before each mortgage is executed we will mark or tag on the face of each pile, mortgaged to O. B. Polk Lumber Company.

"6. We agree to carry fire insurance to the full value of all lumber on which advances are made by you with a loss payable clause payable to O. B. Polk Lumber Company, as its interest may appear, said policy to be held by you, and in the event we should fail to cause the issuance of such insurance you are hereby authorized to have such insurance written and carried at our expense.

"7. We agree to pay you interest at the rate of eight per cent per annum on the cash advances from the date of each advance as long as said advance or any portion thereof is outstanding and unpaid. By this is meant that our advancing account with you and the notes we give you on such advances are to be credited with all shipments made by us on your orders as of the date of bill of lading on each car.

"8. We agree to pay you a selling commission of ten (10%) per cent on the F. O. B. mill value.

"9. At the time of shipment this will be your authority to deduct the amount of the advance per thousand feet on such lumber as is shipped, your selling commission of ten (10%) per cent together with the two (2%) per cent discount for cash. After these deductions the balance on each shipment is to be remitted to us twice each month on the first and 15th of each and every month for shipments made during said months.

"10. We are to have the privilege at our option of being furnished upon demand, for our inspection, the original signed orders from all customers or buyers of our lumber.

"11. All estimates of lumber on hand upon which advances are to be made is to be to the mutual satisfaction of both parties.

"12. It is understood that we are not obligated to fill any orders you send which we deem too low and less than the prevailing market price, or upon which we can obtain better prices, as we reserve the right to sell the lumber under this contract provided you approve the credit rating and standing of such respective buyers, and further provided that such sales are handled through your office.

"13. We agree to keep said lumber properly piled on foundations and keep them protected against the elements.

"14. It is understood that you shall not be called upon to make advances except on a minimum amount of 100,000 feet, and in the event we have in stack less than 100,000 feet at the time of inspection by your representative, his traveling expenses shall be paid by us; but in no event are we to pay expenses provided we have in stack 100,000 feet or more.

"15. This contract is effective from this date, June 8, 1928, until December 31, 1928, and during said period you are to handle the entire hardwood cut of our mill in accordance with the terms hereof. We understand that you are not expected to have advanced to us at any one time an amount in excess of twenty-five thousand and no/100 ($25,000) dollars.

"16. Your acceptance below will constitute a contract between us."

The above contract was signed and approved by the respective parties.

Under the assignments of error it is the contention of appellant that by the terms of the above contract the defendant was appointed the exclusive sales agent to market all of the hardwood lumber cut by complainant at its mill in Seiper, Louisiana, and to receive ten per cent commission on the F. O. B. mill value; that this exclusive sales agency was a part of the consideration to the defendant for making the advancements and that this ten per cent represented a property interest in the lumber so cut under the contract, and was an insurable interest, and was as fully covered and protected by the fire insurance policies as was the money advanced by it to the complainants under the contract; that complainants, therefore, only had ninety per cent interest in the lumber after the cost of cutting was deducted and that defendant had a ten per cent interest. This contract was dated at Alexandria, Louisiana, and provided the Louisiana legal rate of interest of eight per cent, and is, therefore, a Louisiana contract. In the opinion filed by the learned Chancellor, and which is contained in the record, the Chancellor quotes a Louisiana statute, and cites certain Louisiana cases. The Louisiana statute is as follows:

"Sec. 6. Of the loss of the thing due.

"Art. 2219: Loss of thing: Debtor in default; Thing stolen: when the certain and determinate substance, which was the object of the obligation is destroyed, is rendered unsalable, or is lost, so that it is absolutely not known to exist, the obligation is extinguished, if the thing has been destroyed or lost, without the fault of the debtor, and before he was in default.

"Even when the debtor is in default, if he has not taken upon himself fortuitous accidents, the obligation is extinguishable in case the thing might have equally been destroyed in the possession of the creditors, if it had been delivered to him."

In the case of Miller v. State, 12 La., 160, a manufacturer of tobacco in Lynchburg, Virginia, sued a commission merchant in New Orleans, Louisiana, for the value of certain tobacco shipped by the former to the latter for sale on commission. The tobacco was destroyed by fire before a sale was made of it by the commission merchant. In that case the court held: "Defendant cannot be allowed commissions except upon sales actually made by him. It is a mere fiction to treat the destruction of the tobacco as a sale."

This holding by the Louisiana court is the usual rule independent of the Louisiana statute above quoted. In 2 C. J., 544, is the statement: "The agency may terminate by operation of law because of a change in the subject matter thereof, as where, in some instances, the subject matter is destroyed."

In 21 R. C. L., 822, it is stated, "Contracts of agency may be terminated by operation of law, but such cases fall within one of three classes, a change in the law, making the required act illegal, a change in the subject-matter of the contract as the destruction of the property by fire, or a change in the condition of the parties, as by death or insanity."

Another Louisiana case is Romero & Bayard v. Newman, 50 La. Ann., 80. In that case Romero and Newman owned adjoining plantations. Newman had a refining mill or plant on his place, and contracted with Romero to install a pipe line from Romero's sugar house to Newman's refining mill and to refine and market the output of Romero's sugar plantation on a commission basis of one cent per gallon of refined molasses. Newman further agreed to advance Romero a certain amount of money for the operation of Romero's sugar plantation. After the contract was entered into and while it was in force the sugar house of Romero was destroyed by fire which rendered it impossible for sugar products to be thereafter conveyed by pipe to Newman's refinery to be refined and marketed by Newman. It appeared that Newman had been collecting a certain government bounty allowed by the government to Romero on sugar productions, and had been applying the same to the commissions due to him for refining and selling the sugar under the contract. After the fire, Newman rendered to Romero a statement showing a balance due on the secured note, plus estimated commissions which had not been paid on sugar that could not be delivered as the result of the fire. Romero refused to agree to Newman's claim for estimated commissions which had. been deducted by Newman out of the bounty which he had collected, on sugar which had not been refined and marketed by Newman. In that case it was held that Newman could not retain commissions on the estimated value of the sugar destroyed by fire, and which had not been sold or marketed by Newman. That case in many respects is very similar to the present case.

It is earnestly insisted by appellant that the defendant had an insurable interest in the lumber burned not only for the amount of money advanced but the ten per cent commissions on the estimated value as well, and that since the insurance policies carried the loss payable clause in its favor as its interest may appear, that his ten per cent commission on estimated value of the destroyed property was covered by the insurance policy and was properly payable to him. This contention is made and based upon the rule that where a person would sustain a financial or pecuniary loss as the result of property being destroyed by fire, whether he be the owner or not, has an insurable interest in the property. May on Insurance

(4 Ed.), Sec. 80; Putman v. Mercantile Ins. Co., 46 Mass. (5 Metc.), 386; 1 Cooley's Briefs on Insurance (2 Ed.), 213; Insurance Co. v. Thurston, 93 Ala., 255; Harrison v. Fortlage, 161 U. S., 57; Insurance Co. v. Chase, 5 Wall., 509.

In 26 C. J., Sec. 7, p. 28, the rule is stated:

> "If by contract a creditor is to look to the proceeds of certain goods for the payment of his claim, or if his compensation will depend upon the sale of certain goods, then he has an insurable interest in such goods to the amount of his claim."

The above authority and rule is cited by appellant as a supporting authority to the contention here being made. Appellant also cites and relies upon the case of Insurance Company v. Thurston, 93 Ala., 255. In that case a contractor entered into a contract to move a house for another person and for which he was to receive stated compensation. He procured a policy of fire insurance payable to himself, insuring against the loss by fire of the building he had contracted to move. While the building was being removed it was destroyed by fire. The insurance company defended suit on the policy on the ground that the contractor had no title or interest in the house, and therefore did not have an insurable interest. The Alabama court held that the contractor had an insurable interest to the extent of the money and labor he had expended in the performance of the contract, and the profit that he would have realized upon completing the contract. Other cases and authorities are cited and relied upon by appellant in support of the contention that it had an insurable interest by reason of the commission provided for in the contract, and that this interest was covered by the insurance policy as much so as the debt for money advanced on the lumber.

The conclusion we reach is that the commission contracted to be paid to the defendant contemplated the rendering of the service of procuring a purchaser and selling the lumber, whether the purchase and sale was made directly by the defendant or by the complainant. The accounts for all sales were guaranteed by the defendant under the contract. Even the sales, if any should be made, by complainant, would have to have the approval of the defendant, and pass through the office of defendant in the same way and manner as sales made directly by the defendant. For this service the defendant was to receive ten per cent commission on all sales made, to be based on the F. O. B. mill price. While it is true the defendant was appointed the exclusive sales agent for all hardwood lumber cut, but before the commissions thereon would accrue defendant would have to render the service as set forth in the contract. The defendant had not rendered any service in the matter of negotiating a sale on the lumber that was destroyed by fire, except the one car which had been contracted for sale, but not shipped out at the time of the

fire. Until the services contemplated by the contract had first been rendered, the defendant could not collect, under the contract, any commissions.

We cannot concur in the contention made by appellant, that because of the exclusive agency for the sale of the lumber as given to the defendant by the contract, its commission accrued when the lumber was cut and piled on the yard of complainant. This commission could only accrue upon the rendition of the service by defendant as set forth in the contract. The complainant was paying eight per cent interest for the money advanced, and as a further inducement to procure the financial assistance, complainants appointed the defendant the exclusive sales agent to market and sell the lumber, and for this service agreed to pay to the defendant a commission of ten per cent. The commission could not accrue until this service had been rendered. If for any reason the defendant failed to render the service of selling and marketing and guaranteeing the accounts the commissions would not accrue. The defendant is a firm and not a corporation, and if Polk, who is the firm, had died, or had gone out of business, or for any reason should become incapacitated to render the service of selling and marketing the lumber, his commission contract would immediately terminate, and this could have occurred before a sale of the lumber burned could have been made, even though the lumber had not burned.

We find no error in the decree of the Chancellor. The assignments of error are overruled, and the decree is affirmed. Appellant and surety on the appeal bond will pay the cost of this appeal.

Heiskell and Owen, JJ., concur.